

# NUMBER 13-23-00124-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

YOMEIDA PEREZ LONGORIA,
INDIVIDUALLY, AND AS NEXT
FRIEND OF MERINA LONGORIA
AND K.L., A MINOR, AND AS
REPRESENTATIVE OF THE
ESTATE OF J.S.C., DECEASED
MINOR, EMMANUEL GUERRA,
AND ROBERT CARDENAS,                                      Appellants,

v.

7-ELEVEN, INC.,                                              Appellee.

## ON APPEAL FROM THE 445TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

# OPINION

**Before Chief Justice Contreras and Justices Silva and Peña[1]**
**Opinion by Justice Peña**

By permissive appeal, Yomeida Perez Longoria, Individually, and as Next Friend of Merina Longoria and K.L., a Minor, and as Representative of the Estate of J.S.C., Deceased Minor, Emmanuel Guerra, and Robert Cardenas, appeal the trial court's summary judgment in favor of appellee 7-Eleven, Inc. (7-Eleven). Appellants complain that the trial court erred in granting summary judgment by misconstruing Chapter 2 of the Texas Dram Shop Act. *See* TEX. ALCO. BEV. CODE ANN. §§ 2.01–.03. We affirm.

## I.    BACKGROUND

On May 17, 2020, sisters Maranda and Merina Longoria, Merina's boyfriend Emmanuel Guerra, and two of Maranda's minor children went to South Padre Island. Maranda and Merina drank alcohol at the beach, and then Guerra, who was the designated driver for the trip, drove the group to Louie's Backyard, where Maranda's boyfriend Randy Padilla joined them. The group continued to drink at Louie's Backyard. After Louie's Backyard, Guerra drove them to a 7-Eleven convenience store.

What happened at 7-Eleven is the crux of this appeal. These events were recorded by video, and the parties dispute how to interpret them. In essence, appellants claim that the group was in the store to purchase alcohol and were exhibiting signs of intoxication. As shown in the video, at one point, Maranda takes an eighteen-pack of Budweiser beer from the beverage cooler and carries it up to the cash register where Padilla is standing.

---

[1] The Honorable Dori Contreras, former Chief Justice of this Court, did not participate in this decision because her term of office expired on December 31, 2024.

Maranda pushes the eighteen-pack up to the cashier, Servando Izaguirre. Izaguirre asks Maranda for her ID, but she instead points to Padilla. After examining Padilla's ID, Izaguirre rings up the beer on the cash register and Padilla pays for it with a card. Padilla takes possession of the beer and has it in his hands as they leave the store. After the group initially leaves the store, Merina, Padilla, and Guerra re-enter the store, where Guerra purchases more alcohol, but Maranda never re-enters.

After the group left 7-Eleven, Maranda and Merina consumed some of the alcoholic beverages from 7-Eleven and drove to Laguna Bob's where the group continued to drink. At one point, Maranda and Guerra got into an argument and Maranda insisted she wanted to drive, and Guerra gave her the keys. On the way home, Maranda lost control of the vehicle, and it rolled over multiple times. Several of the passengers were injured or killed, including Merina and the two minor children. Maranda was eventually convicted of felony Driving While Intoxicated.

A lawsuit was filed by several of the passengers of the vehicle, or their representatives, against 7-Eleven, alleging a claim under the Texas Dram Shop Act. *See id*. 7-Eleven filed several motions for traditional summary judgment, arguing that there was no claim under the Dram Shop Act because (1)  Maranda, as the driver who caused the accident, was not sold, served, or provided alcohol by 7-Eleven; (2) Padilla, who purchased the alcohol from 7-Eleven, was not the driver of the vehicle; and (3) Maranda was not obviously intoxicated, and was not a danger to herself, when the putative provision was made. The trial court granted 7-Eleven's traditional summary judgment motions, and in its order, noted that it was unclear whether the "sale of alcohol or the provision or alcohol to only 'one' recipient member of a group visiting a retailer mean[s]

3

that the remaining members of the group are also 'provided' alcohol for purposes of making all group members '[r]ecipients,' including the non-purchasers in the group[.]" The trial court noted that there was a

> controlling question of law, for which there is a substantial ground of difference of opinion, [namely,] whether [Maranda] . . . was the individual 'provided' with [7-Eleven's] alcohol, when [Padilla] . . . was the [i]ndividual [r]ecipient who was sold [7-Eleven's] alcohol, which he paid for with his own funds, and hauled away in his own hands[.]

This permissive appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (allowing courts of appeals to accept permissive appeals if "(1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation").

## II. STANDARD OF REVIEW

"We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (Tex. 2019). "A party that moves for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022) (citing TEX. R. CIV. P. 166a(c)). Further, when summary judgment depends on an issue of statutory construction, we review that issue de novo. *Id*. (citing *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018)). In construing a statute, "[o]ur objective is to ascertain and give effect to the Legislature's intent." *In re D.S.*, 602 S.W.3d 504, 514 (Tex. 2020).

Any time we endeavor to construe statutory language, well-established

4

rules guide our analysis. Fundamentally, we look to the statute's text—to the words it actually uses—and apply the common, ordinary meaning of those words "unless the text supplies a different meaning or the common meaning leads to absurd results." [*Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 131 (Tex. 2018)]. We construe the words in light of their statutory context, considering the statute as a whole. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019).

*Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 718 (Tex. 2024).

When reviewing the text of a statute, we may "consider legislative history and other construction aids regardless of ambiguity." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018) (citing TEX. GOV'T CODE ANN. § 311.023). However, "[i]f the text's meaning is unambiguous, we do not resort to extrinsic aids or special rules of construction." *Malouf*, 694 S.W.3d at 718 (citing *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389 (Tex. 2014)). "A statute is ambiguous if its words are susceptible to two or more reasonable interpretations and we cannot discern legislative intent from the language alone." *Fort Worth Transp. Auth.*, 547 S.W.3d at 838 (citing *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n.*, 511 S.W.3d 28, 41 (Tex. 2017)). Only when those words are ambiguous do we "resort to rules of construction or extrinsic aids." *In re Estate of Nash,* 220 S.W.3d 914, 917 (Tex.2007) (citing *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865–66 (Tex. 1999)).

Lastly, "Texas follows the rule that statutes in derogation of the common law are not to be strictly construed." *Smith v. Sewell*, 858 S.W.2d 350, 354 (Tex. 1993) (citing TEX. GOV'T CODE Ann. § 312.006(b)). "Nevertheless, it is recognized that if a statute creates a liability unknown to the common law, or deprives a person of a common law right, the statute will be strictly construed in the sense that it will not be extended beyond

5

its plain meaning or applied to cases not clearly within its purview." *Id*. (citations omitted).

### III. APPLICABLE LAW

"The Legislature enacted the Dram Shop Act to 'deter providers of alcoholic beverages from serving alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public.'" *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007) (quoting *Sewell*, 858 S.W.2d at 356). "In the Dram Shop Act, the Legislature created a duty, not recognized at common law, on alcohol providers and increased the potential liability of providers as a means of deterring providers from serving obviously intoxicated individuals." *Id*. at 684. "Historically, the 'rule of non-liability' held that an alcohol provider owed no duty to third persons for injuries caused by the provision of alcohol." *Id*. (citations omitted). "The common law effectively precluded dram shops from incurring liability when their intoxicated patrons caused injury to third parties." *Id*. (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 309 (Tex. 1987)).

> The rule of non-liability was two-fold. First, the consumption, not the sale or service of alcohol, was viewed as the sole proximate cause of the patron's intoxication and later injury to a third party. An able-bodied person was responsible for his or her own actions. Second, even if the sale were a proximate cause of the intoxication, injury to a third person was an unforeseeable result of the patron's intoxication.

*Poole*, 732 S.W.2d at 309.

"[I]n 1987 the Court in *Poole* discarded the 'absolute rule of no liability' and imposed a duty on a dram shop not to serve alcoholic beverages to a person it knows or should know is intoxicated." *Duenez*, 237 S.W.3d at 684.

> The Legislature acted to address the problem of providers' excessive provision of alcohol to patrons. A week after this Court issued *Poole,* the

Dram Shop Act became effective and narrowed potential liability from *Poole* in several ways. *See* [*Poole*, 732 S.W.2d at 313]. First, it made the Act the exclusive means of pursuing a dram shop for damages for intoxication. TEX. ALCO. BEV. CODE [ANN.] § 2.03. Second, as an element of liability, the patron must be "*obviously* intoxicated," not just intoxicated, when the dram shop serves him alcohol. *Id.* § 2.02 (emphasis added). Third, under Chapter 2, "the intoxication of the recipient must be a proximate cause of the damages." *Sewell*, 858 S.W.2d at 355 (citing TEX. ALCO. BEV. CODE [ANN.] § 2.02(b)).

*Id.* at 684–85; *see also Poole*, 732 S.W.2d at 314 (noting that under the Dram Shop Act, a plaintiff must satisfy an "onerous burden of proof").

Chapter 2 of the Dram Shop Act contains three subsections: § 2.01 ("Definitions"), § 2.02 ("Causes of Action"), and § 2.03 ("Exclusivity of Statutory Remedy"). In § 2.01, the Dram Shop Act defines the noun "provider" and the verbal noun "provision":

(1) "Provider" means a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual.

(2) "Provision" includes, but is not limited to, the sale or service of an alcoholic beverage.

TEX. ALCO. BEV. CODE ANN. § 2.01.

The relevant portion of § 2.02, provides as follows:

(b) Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter and may be made the basis of a revocation proceeding under Section 6.01(b) of this code upon proof that:

(1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

*Id.* § 2.02.

"When enacting Chapter 2, the Legislature specifically considered and rejected the inclusion of civil liability for social hosts." *Smith v. Merritt*, 940 S.W.2d 602, 605 (Tex. 1997) (citations omitted). Chapter 2 was first proposed in the Senate Committee on Economic Development's committee substitute of House Bill 1652. *See* S. Comm. on Economic Development, 70th leg., R.S., Tex. C.S.H.B. 1652 (May 25, 1987). While the definition of "provision" currently in § 2.01 has been the same since Chapter 2 was first proposed, the definition of "provider" was first defined more expansively, as follows:

> "Provider" means a supplier, seller, or server of an alcohol beverage and includes without limitation a person who provides an alcoholic beverage without a charge as a "host" or a person who sells or serves an alcoholic beverage as a holder of a permit or license, issued under the terms of this Code, authorizing the sale or service of an alcoholic beverage to a consumer.

*Id*.

## IV.    DISCUSSION

Appellants frame their issues as follows:

> In a retail context, under Tex. Alc[o]. Bev. Code [Ann.] § 2.02, may a business operating through a [Texas Alcoholic Beverage Commission] TABC license be considered to have "provided" alcohol to a customer who is not the purchaser, or does the statute extend "Provider" liability only to the actual "sale" of alcohol?
>
> In any context, is it outcome determinative under Tex. Alc. Bev. Code [Ann.] § 2.02 that an obviously intoxicated person to whom alcohol is "sold[,] served or provided" drove a vehicle to or from the place of business that "sold, served or provided" the alcohol to[Maranda]?
>
> Did the trial court err in granting summary judgment on the record before it?

7-Eleven, in framing its issues, focuses on whether the Dram Shop Act allows for the imputation of "group-based liability," according to which, "if a retailer sells or provides alcohol to any member of a group of intoxicated customers, the seller is potentially liable

8

if any member of the group subsequently hurts or injures someone due to their intoxication." Consistent with the certified question on appeal, we reframe the issue as follows: whether, upon these facts, Maranda was a "recipient" under the statute based on the purchase of alcohol by Padilla. *See Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 147 (Tex. 2022) (noting that the permissive appeal statute allows appellate courts to "address the merits of the legal issue certified" and to address "all fairly included subsidiary issues and ancillary issues pertinent to resolving the controlling legal issue").

This answer depends on how widely or narrowly we construe the phrase "but is not limited to" when the Act states that "'provision' includes, *but is not limited to*, the sale or service of an alcoholic beverage." TEX. ALCO. BEV. CODE ANN. § 2.01(1) (emphasis added); *see Fort Worth Transp. Auth.*, 547 S.W.3d at 838 ("We read statues contextually to give effect to every word, clause, and sentence, because every word or phrase is presumed to have been intentionally used with a meaning and a purpose." (citations omitted)). Appellants suggest that the phrase "but is not limited to" in the definition of "provision" gives that term enough flexibility to reach the facts here. For reference, appellants point to the prohibition against secondary sales, or straw purchases, of alcohol for minors, and argue that the Act should likewise reach secondary sales to obviously intoxicated individuals. According to 7-Eleven's position, whatever work the phrase "but is not limited to" is doing, it cannot sustain appellants' claims because Maranda did not purchase the alcohol from 7-Eleven, and only the purchaser of the alcohol could qualify as a "recipient" as a matter of law. *See* TEX. ALCO. BEV. CODE ANN. § 2.02(b)(2) (requiring "the intoxication of the recipient of the alcoholic beverage" to be the proximate cause of damages).

9

## A.	7-Eleven's Argument

At the outset, we note the crux of the statutory dilemma: the definition of "provider" and of "provision" are not consistent because the verbal noun "provision" is defined by reference to a broader range of conduct than the conduct defining "provider." TEX. ALCO. BEV. CODE ANN. §§ 2.01(1), (2); *see Fort Worth Transp. Auth.*, 547 S.W.3d at 838 (noting that "[a] statute is ambiguous if its words are susceptible to two or more reasonable interpretations and we cannot discern legislative intent from the language alone"). "Provider" is defined with reference to "selling" or "serving," but the definition of "provision" is not so limited because the text provides that "provision" is "not limited to" selling or serving. TEX. ALCO. BEV. CODE ANN. § 2.01(1), (2).

For this reason, we cannot endorse 7-Eleven's interpretation of the statute. Underlying 7-Eleven's interpretation is the premise that the criteria which deem a person a "provider" under § 2.01(1) constrains our analysis under § 2.02(b).[2] We find no support for reading "recipient" only with reference to the act by which one becomes a "provider" under the statute. A "[r]ecipient" can be any individual to whom a "provider" either "sold,

---

[2] This interplay of the subsections is implicit when 7-Eleven argues that Maranda was not a recipient as a matter of law because its failure to either sale or serve her alcohol exhausts the potential factual bases of liability. For example, at the summary judgment hearing, counsel for 7-Eleven argued: "At the time of the provision, the [7-Eleven] sale, was it apparent to [Izaguirre] that Maranda [was] being sold alcohol[?] Not applicable. . . . Was she served? No. . . . [Maranda] is not the recipient under the law." This is why, in the trial court and on appeal, appellants have framed 7-Eleven's position as requiring a recipient to have privity of contract with the provider. 7-Eleven, however, never addresses the starting point of appellants' analysis, which is the semantic flexibility in the phrase "but is not limited to." TEX. ALCO. BEV. CODE ANN. § 2.01(2). Considering the countervailing flexibility of the phrase "but is not limited to" in the definition of "provision," which favors appellants, the only way to neutralize the fact that a "recipient" can be any obviously intoxicated individual "being sold, served, or *provided*," with an alcohol beverage, *id.* § 2.02(b)(1) (emphasis added), is to point to some other textual indication signaling an inherent limitation to the actionable situation envisioned by the Legislature. Also, reference to § 2.01(1) is how 7-Eleven proposes to constrain the causation analysis to only one recipient. This concern is evident when counsel for 7-Eleven argued at the summary judgment hearing that, "you cannot have two recipients. It is only one recipient. So Padilla paid for the alcohol that night. . . . At [7-Eleven] he paid for the Budweiser beer. But he didn't crash. There is no causation."

served, or *provided*[3] with an alcoholic beverage[.]" *Id*. § 2.02(b)(1) (emphasis added). Both the noun "provider" and the verbal noun "provision" are defined with reference to verbs, i.e. conduct. "Provider" is defined with reference to "selling" or "serving," but the definition of "provision" is not so limited. *See id*. §§ 2.01(1), (2). Thus, by definition, *there is some conduct that will constitute the act of providing an alcoholic beverage that does not make one a "provider" under the statute*. If this is the case, then the word "recipient" in § 2.02(b)(2) cannot be exclusively defined in terms of § 2.01(1), because the sale or service of alcohol is not the only means by which a person can be a "recipient" within the meaning of the statute. This is further supported by the fact that the word "recipient" in § 2.02(b)(2) refers to "the individual being sold, served, or *provided* an alcoholic beverage" in § 2.02(b)(1). *Id*. § 2.02(b)(1) (emphasis added); *See Boyd v. Fuel Distributors, Inc.*, 795 S.W.2d 266, 271 (Tex. App.—Austin 1990, writ denied) ("[W]e believe it is clear from reading the statute that *the recipient* referred to in [§] 2.02(b)(2), . . . is *the obviously intoxicated individual* referred to in [§] 2.02(b)(1) to whom the provider sold, served, or provided alcohol despite the fact that the recipient's dangerous condition was apparent").

Because a "recipient" can be one who is "provided" an alcoholic beverage, and "provision" extends beyond selling and serving, we cannot endorse 7-Eleven's argument that because Padilla was the purchaser of the alcohol, he must be the only potential "recipient" under § 2.02(b)(2) as a matter of law. *See* TEX. ALCO. BEV. CODE ANN. § 2.02(b)(2).

---

[3] Neither party disputes that the word "provided" here should be defined by reference to the definition of "provision" under TEX. ALCO. BEV. CODE ANN. § 2.01(2).

7-Eleven also argues that several cases control here. These arguments are based on 7-Eleven's view that appellants urge a "group-based" theory of liability according to which a provider can be said to have "provided" alcohol to an entire group and be held liable for the actions of any member of that group. For reference, 7-Eleven cites to *Calvillo v. Frazier*, in which the plaintiff sued under the Dram Shop Act and lost on summary judgment, and on appeal unsuccessfully argued that "under the Act, a private club 'provides, sells, or serves' all of the alcoholic beverages consumed in the club because all alcohol consumed in the club comes from the club, as opposed to any outside source." 511 S.W.3d 194, 196 (Tex. App.—Dallas 2015, no pet.). 7-Eleven claims that appellants' argument is like the unsuccessful argument urged by the appellant in *Calvillo* but applied to the context of a commercial retail store.

7-Eleven also points us to *Southland Corp. v. Lewis*, where the Texas Supreme Court found that a plaintiff could not sue 7-Eleven under the Act where the purchaser of the alcohol was the passenger of the vehicle which caused the accident, and "there was no evidence that [the purchaser] interfered with [the non-purchaser's] driving." 940 S.W.2d 83, 85 (Tex. 1997). *Lewis* stands for the proposition that the Dram Shop Act "imposes liability only when a provider serves alcohol to an obviously intoxicated individual, and the intoxication of that individual proximately causes harm." *Id.*. "Under this standard, the sale of alcohol to a passenger cannot be the cause in fact of an accident unless the passenger caused the accident by interfering with the operation of the car." *Id.* (citing *Boyd*, 795 S.W.2d at 272).

We do not understand appellants to have urged such a group-based theory of liability. In fact, during the summary judgment motion hearing, counsel for appellants

12

informed the trial court that it was not adopting the reasoning on any of the complained-of cases relied upon by 7-Eleven, explicitly disclaiming the applicability of *Calvillo*, *Southland Corp*., and *Boyd*. In short, 7-Eleven argues that these cases are controlling, whereas appellants argue that they are not. We agree with appellants.

In *Calvillo*, the court of appeals rejected appellant's argument that a driver who caused an accident "was provided, sold, or served alcohol merely because the alcohol served in the [club] ultimately came from the [club]." 511 S.W.3d at 196. Unlike here, there was never an allegation that the club directly provided the driver with the alcohol during a face-to-face interaction:

> Here, the evidence showed Felicia and Sherrie "never bought a drink" at the Kliff Klub. Instead, Sherrie testified in her deposition that men bought her drinks, and Felicia testified she drank alcohol from her daughter's drink. Thus, *Felicia's consumption of alcohol at the Kliff Klub was twice removed from the provision of alcohol to the men who purchased it and gave it to Sherrie*. Further, there was no evidence to show Felicia was intoxicated while at the Kliff Klub. Under these circumstances, we reject Calvillo's argument that Felicia was provided, sold, or served alcohol merely because the alcohol served in the Kliff Klub ultimately came from the Kliff Klub. Because no evidence existed to show Felicia was served alcohol by the Kliff Klub, no cause of action was available to Calvillo under the Act.

*Id*. at 196–97 (emphasis added).

Appellants do not allege that 7-Eleven provided alcohol to a third person who then gave it to Maranda, the claim is that 7-Eleven provided alcohol to Maranda.[4] Thus, *Calvillo* is inapposite. Further, appellants do not argue that the intoxication of any passenger caused the complained-of accident. Thus, this case is also inapposite from

---

[4] As counsel for appellants argued at the motion for summary judgment hearing: "I think he talked about the *Calvillo* case, and *Boyd* case where there wasn't evidence that the alcohol was provided to the mother. Well, we have evidence that it was provided to the Maranda. We have video. I mean, we literally see the transaction occurring."

13

*Southland Corp*. and *Boyd*. *See Southland Corp*, 940 S.W.2d at 85 ("Lewis cannot establish proximate cause through 7–Eleven's sale of alcohol to [passenger] Ernemann."); *Boyd*, 795 S.W.2d at 272 (holding that plaintiff could not show causation under the Dram Shop Act because "[t]here was no suggestion that anything" the passenger-recipient did "interfered with [the driver's] operation" of his car). Also, in *Southland Corp*., the summary judgment evidence established that the driver never entered the store nor consumed any of the alcohol purchased from the store. 940 S.W.2d at 85. Here, 7-Eleven does not dispute that Maranda, the driver, entered the store, and acknowledges that "Guerra testified that Maranda and Merina consumed some of the alcohol he and Padilla had purchased [from 7-Eleven]."

Thus, we agree with 7-Eleven that the Dram Shop Act does not sanction group-based liability, which we understand to simply mean that there can be no liability where the intoxication of an individual causes an injury, but that individual was not directly provided, sold, nor served alcohol, and where a second individual facilitates the provision of alcohol. *See id*. at 84–85. However, because the summary judgment evidence established that Maranda entered the store and interacted with Izaguirre face-to-face, the cases surveyed by 7-Eleven are not controlling. According to appellants, there was no third person facilitating the provision of alcohol to Maranda.

## B.    Appellants' Argument

As shown above, however "provision" is defined, it must mean something in addition to "selling" or "serving" alcohol. TEX. ALCO. BEV. CODE ANN. § 2.01(2); *see TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) (noting that we must interpret "each provision [of a statute] so that none is rendered meaningless or mere

14

surplusage"). According to appellants, we may look to the phenomenon of secondary sales, or straw purchases, of alcohol for minors to help define the meaning of "provision." In interpreting the statute, appellants ask us to look to the criminal prohibition against the secondary sale of alcohol to minors and the general purpose of the Dram Shop Act:

> Texas law prohibits the secondary sale, service, or provision of alcohol to persons who should not be allowed to purchase it directly. For example, Texas law criminalizes the sale and service of alcohol to minors. TEX. ALC[O]. BEV. CODE [ANN.] § 106.03. 7-Eleven's Operations Manual and training modules explain in detail why clerks may not sell to a "straw person" who is purchasing for a minor. These are called "secondary sales," and the basis for their prohibition is obvious: do not sell alcohol to "Person A" if it is apparent that the actual intended recipient is "Person B", to whom 7-Eleven cannot lawfully sell alcohol directly.
>
> "Secondary sales" can also occur when the person who receives alcohol could not purchase it because they are too drunk. The same rationale for prohibiting a secondary sale to a minor applies to the secondary sale, service, or provision of alcohol to an intoxicated person. It makes no sense to prohibit minors from using others to procure alcohol but allow intoxicated persons to do it. Both straw purchases harm society and pose an extreme public danger.

While appellants may be correct that prohibiting secondary sales to obviously intoxicated adults would be consistent with the statute's purpose, that tells us nothing as to whether doing so would be consistent with the statute's text. *See Rapanos v. United States*, 547 U.S. 715, 752 (2006) (plurality op.) ("And as for advancing 'the purpose of the Act': We have often criticized that last resort of extravagant interpretation, noting that no law pursues its purpose at all costs, and that the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations."). In prohibiting secondary sales to minors, the Legislature did so explicitly by imposing a criminal sanction where a "person purchases an alcoholic beverage *for* or gives an alcoholic beverage to a minor." TEX. ALCO. BEV. CODE ANN. § 106.06 (emphasis added). In contrast,

nowhere in Chapter 2 is there any similar language authorizing a court to inquire into the purposes of a transaction. *See Id*. §§ 2.01–.03.

In *Abramski v. United States*, the United States Supreme Court was met with a similar question under the federal gun laws, which prohibit a dealer from selling a firearm to certain "persons" or "transferees." 573 U.S. 169, 178 (2014). Abramski had purchased a gun for his uncle and was convicted for making a false statement on a federal form asserting that he was the "actual transferee/buyer" when he was not. *Id*. at 175. According to Abramski, "Congress's use of ['persons' and 'transferees'] alone, *sans* any mention of 'straw purchasers' or 'actual buyers,' shows that '[i]t is not illegal to buy a gun for someone else.'" *Id*. at 178. Like appellants, the *Abramski* majority read the word "person" to include the intended recipient of a gun based on the overarching purposes of the federal gun laws. *Id*. at 180. However, unlike *Abramski*, here, there is no argument that refusing to impose liability "would virtually repeal" the Dram Shop Act's "core provisions." *Id*. at 179–80 ("As noted earlier, the statute establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background. It also requires that the information so gathered go into a dealer's permanent records. The twin goals of this comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." (citations omitted)).

Furthermore, in *Abramski*, Justice Scalia authored a dissent joined by Chief Justice Roberts, and Justices Thomas and Alito. Justice Scalia would have concluded that the statute at issue, by use of the terms "persons" or "transferees," does not encompass any distinction between an actual recipient and an intended recipient, and consequently

16

Abramski's uncle was not the "person" to whom the gun was sold:

> The contrary interpretation provided by the Government and the majority founders on the plain language of the Act. We interpret criminal statutes, like other statutes, in a manner consistent with ordinary English usage. *In ordinary usage, a vendor sells (or delivers, or transfers) an item of merchandise to the person who physically appears in his store, selects the item, pays for it, and takes possession of it*. So if I give my son $10 and tell him to pick up milk and eggs at the store, no English speaker would say that the store "sells" the milk and eggs to me.

*Id.* at 196 (Scalia, J., dissenting) (emphasis added).

We agree with Justice Scalia's reasoning. It is not consistent with the text of § 2.02 to make any distinction between an actual recipient and an intended recipient. The statute only refers to "an individual being provided, served, or sold" alcoholic beverages. TEX. ALCO. BEV. CODE ANN. § 2.02(b)(1). As Justice Scalia suggests, in common usage, a person who buys an item "physically appears" in a store, "selects the item, pays for it, and takes possession of it." *Ambraski*, 573 U.S. at 196 (Scalia, J., dissenting). The Legislature could have imposed liability in Chapter 2 for secondary sales by inquiring into the purpose of a transaction, as it did in § 106.06, but it did not do so.

For all the above reasons, we reject appellants' argument that § 2.02 reaches secondary sales because the text of the statute does not encompass any distinction between an actual recipient and an intended recipient.

## C. The Problem of Multiple Recipients

Implicit in 7-Eleven's position is a concern that, under appellants' theory, a single transaction can impermissibly form the basis of numerous causes of action based on the conduct of multiple members in a group. For example, a creative plaintiff could describe a single transaction as counting both as selling alcohol to one recipient and providing it

17

to another. During the summary judgment hearing, counsel for 7-Eleven made this concern explicit: "you cannot have two recipients. It is only one recipient." Given the broad definition of "provision," does the statute permit a plaintiff to describe a single transaction as both an act of selling or serving alcohol to one recipient, and of providing alcohol to another? A review of the case law suggests that in certain limited circumstances, a single act of selling or serving alcohol to one recipient may also serve as a cause of action for providing alcohol to another recipient because that single act of selling or serving is part of a pattern of conduct in which the provider allows the individual to consume alcohol.

For example, when the *Calvillo* court concluded that there can be no liability where a private club sells drinks to patrons who then give those drinks to an obviously intoxicated individual, it noted that the case may have been different had it involved bottle service. 511 S.W.3d at 197 ("In reaching this conclusion, we note this case did not involve the 'service' of a bottle of wine or pitcher of beer for consumption by multiple customers."). Specifically, the *Calvillo* court cited to this Court's opinion in *Bruce v. K.K.B., Inc.*, wherein we reversed the granting of summary judgment in favor of a restaurant in a case involving bottle service. 52 S.W.3d 250, 255 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied).

Bottle service is one of the few situations where a single transaction can be described as both a sale to one recipient and a provision to another. This is because by providing bottle service, a provider is allowing an individual to serve themselves alcohol. *See, e.g., Beamers Private Club v. Jackson*, No. 05-19-00698-CV, 2021 WL 1558738, at *5 (Tex. App.—Dallas Apr. 21, 2021, pet. dism'd) (mem. op.) ("We conclude—viewing the evidence in the light most favorable to the verdict—that a reasonable fact finder could

18

have concluded that appellants served alcohol to Brent, *or allowed him to serve himself*, in violation of the standard imposed by the Act." (emphasis added)). For example, in *Beamers*, the Fifth Court of Appeals upheld a jury verdict under the Dram Shop Act based on the plaintiff's legal theory, supported by expert testimony, that the defendant allowed an obviously intoxicated individual to "*to self-serve himself without appropriate supervision* while he was obviously intoxicated to the extent that he was a danger to himself and others." *Id*. at *4 (emphasis added). The evidence showed that the defendant served numerous drinks to a group of individuals, including "three bottles of champagne," with "twenty glasses," "one bottle of Hennessy," "a cognac," and bottles of vodka. *Id*. at *3. Neither the parties nor the court of appeals seemed concerned with narrowing down a specific instance of selling or serving in order to impute liability; it was the defendant's course of conduct in allowing an obviously intoxicated person to serve himself alcohol that constituted provision. *See id*. at *5. In such situations, a provider should not be able to avoid liability as a matter of law simply by arguing that the obviously intoxicated individual was never directly sold or served an alcoholic beverage, even where a plaintiff is able to marshal evidence that the provider was aware of or encouraged the consumption of alcohol by that individual. *See* Tex. Gov't Code Ann. § 311.023(5) (providing that courts may consider the "consequences of a particular construction" when interpreting a statute); *see also* Tex. Alco. Bev. Code Ann. § 1.03 ("This code is an exercise of the police power of the state for the protection of the welfare, health, peace, temperance, and safety of the people of the state. It shall be liberally construed to accomplish this purpose."); *In re D.S.*, 602 S.W.3d at 514 ("Our objective is to ascertain

and give effect to the Legislature's intent.").[5]

## D. Affirmative Act Required by Recipient

Because there are narrow circumstances in which we could say that a single transaction has multiple recipients, the issue before us becomes whether the Dram Shop Act would allow for multiple recipients under the facts presented and whether Maranda can qualify as one of those recipients. We think that neither dictionary definitions nor the common usage of the verb "provide" resolve the issue. For example, appellants provide the following dictionary definitions of "provide": "to supply with needed materials (such as food)," and "as in to give, to put something into the possession of someone else for use or consumption." Appellants argue that these definitions support their position, and 7-Eleven offers us no other competing definitions that would definitively exclude these facts from their scope. Further, we cannot think of any common usage analysis that would resolve the question one way or the other.[6]

There is another word in the statute that provides some interpretive relief. In particular, the Legislature used the word "recipient," TEX. ALCO. BEV. CODE ANN.

---

[5] Another situation where a plaintiff may describe a single act of selling or serving to one recipient as also the provision of alcohol to another recipient is where employees are provided alcohol. *See Bolanos v. Purple Goat, LLC*, 649 S.W.3d 753, 762 (Tex. App.—El Paso 2022, no pet.) (dismissing common law negligence claims against employer-provider for the actions of an employee-recipient as precluded under the Dram Shop Act where the employer "allowed" the employee to consume alcohol, and noting that the Legislature amended § 2.03 and "specifically added 'employees' to the group of persons subject to the exclusive remedy provision"). As the committee report accompanying the bill authorizing the amendment to § 2.03 noted, there was a need for clarification because "[i]n some cases since the passage of the Act, providers have been sued under the Act for injuries caused by employees who *consumed alcohol while on the job*." S. Comm. On Economic Development, Bill Analysis, 78th leg., R.S., Tex. C.S.H.B. 1652 (Committee Report) (Substituted) (September 1, 2003) (emphasis added).

[6] Consider a teacher who places handouts in front of each student, and where no student touches the handouts. It would not be improper English for the teacher to announce at the beginning of class, "each of you has been provided with the assignment for today." Why could we not likewise say that 7-Eleven provided Maranda alcohol by making the alcohol generally available to her?

20

§ 2.02(b)(2), which we presume the Legislature "intentionally used with a meaning and a purpose." *Fort Worth Transp. Auth.*, 547 S.W.3d at 838. In common ordinary English usage, "receive" is a verb that generally implies some affirmative act on the part of the recipient. *See Receive*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "receive" as "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source").[7] As shown by Justice Scalia in *Abramski*, the recipient of a sales transaction will be the individual who physically appears in the store, selects the item, and "takes possession of it." 573 U.S. at 196 (Scalia, J., dissenting). If, for example, Abramski had left the store without the gun in his possession, it would not be correct to say that the gun dealer sold Abramski the gun. The physical taking possession of the gun is the affirmative act which completes the sale.

Which affirmative acts complete a particular instance of serving or providing? It cannot be the mere taking possession of alcohol. With respect to serving, consider, for example, a bartender who physically pours an alcoholic beverage and places it in front of an obviously intoxicated individual. The individual grabs the glass but does not drink it. The bartender, realizing that the individual is intoxicated, tells them to leave the bar. The intoxicated individual later causes an accident. Is the individual a recipient under the Dram Shop Act? One could say that the actions of the bartender, along with the individual's conduct in grabbing the glass, make him an "individual being . . . served . . . with an alcohol beverage[.]" TEX. ALCO. BEV. CODE ANN. § 2.02(b)(1). After all, one says "dinner

---

[7] This is why one asks another, "did you receive my message?" The speaker is not in doubt that they sent a message, or even that the message was transmitted; rather, the speaker is trying to ascertain if the other person did some affirmative act by which we can say that they became the recipient of the message, e.g., by reading it.

is served" before partaking of a meal, not after. Nor can the causation requirement exclude this situation because the Act only requires that the "the intoxication of the recipient" cause the accident, not that the alcohol consumed by the individual cause the accident. *Id*. § 2.02(b)(2). Furthermore, even if the individual did not touch the glass or otherwise arguably take possession of the glass, it would not be improper English to say that the bartender "served" that individual. Sometimes we say "dinner is served" before anybody lifts a fork.

To change the hypothetical slightly to mirror the scenario presented here, what if the individual who grabbed the glass, unbeknownst to the bartender, had secreted drinks before being kicked out, and consumed them before the accident? Does the Dram Shop Act allow for liability in such cases? As shown below, we think not, because absent the affirmative act of consuming alcohol on the premises, a non-purchaser has not completed an actionable instance of either serving or providing, and the non-purchaser is not a "recipient" under the Act. *See* Tex. Alco. Bev. Code Ann. § 2.02(b)(2).

## E.    Non-Purchaser Must Consume Alcohol On-Premises

"As a general rule, a person is under no duty to control the actions of third persons absent a special relationship," including one imposed by statute. *Moore v. Shoreline Ventures, Inc.*, 903 S.W.2d 900, 903 (Tex. App.—Beaumont 1995, no writ) (citing *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716 (Tex. 1995)). As the *Duenez* court noted,

> The Act provides a previously foreclosed remedy against sellers of alcohol. And unlike the prior common law, *dram shops now owe a duty to patrons and injured third parties* under specified circumstances and can be subject to civil liability for the damages they proximately cause. *Compare Poole,* 732 S.W.2d at 309 *with Sewell,* 858 S.W.2d at 355. The Legislature also deterred irresponsible conduct by providing that a dram shop's alcohol license is subject to revocation for violating the Act. Tex. Alco. Bev. Code

22

[ANN.] § 2.02(b).

237 S.W.3d at 685 (emphasis added).

As *Duenez* suggests, the Dram Shop Act imposed a duty owed to purchasers (i.e. those who are sold alcohol), imposed a separate duty owed to patrons (i.e., those who are served or provided alcohol), and noted that the reasoning in *Poole* touched only on the duty owed to patrons. *Id*. Prior to *Poole*, "the law recognized no common-law duty to third parties on a part of the provider of alcohol – the rationale being that the consumption of alcohol, rather than the provision of it, proximately caused the injury." *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993) (citing *Poole*, 732 S.W.2d at 309). When the *Poole* court recognized a common law cause of action against a dram shop, it did so based on the dangers inherent in drinking and driving, where an individual consumes alcohol furnished by a dram shop on the premises and then drives. 732 S.W.2d at 309–14; *see* TEX. GOV'T CODE ANN. § 311.023(2) (permitting courts to consider the "circumstances under which [a] statute was enacted" when construing a statute).

The Dram Shop Act was enacted after the decision in *Poole*, which "imposed a duty," unknown at common law, "on a dram shop not to serve alcoholic beverages to a person it knows or should know is intoxicated." *Duenez*, 237 S.W.3d at 684 (citing *Poole*, 732 S.W.2d at 310). When the *Poole* court abandoned the rule of non-liability in favor of recognizing a provider's "duty to the general public not to serve alcoholic beverages to a person when the licensee knows or should know the patron is intoxicated," it reasoned that the common law assumption that "injury to a third person was an unforeseeable result of [a] patron's intoxication" was incorrect "as dictated by conditions and circumstances of modern society." 732 S.W.2d at 309–14. The *Poole* court reasoned that, with respect to

23

drunk driving, "a patron's criminal act is a foreseeable consequence in light of our universal use of automobiles and accidents involving drunk drivers." *Id*. at 314. The court then approvingly cited the following language from the Arizona Supreme Court:

> Common sense, common experience and authority all combine to produce the irrefutable conclusion *that furnishing alcohol, consumption of alcohol, and subsequent driving of a vehicle* when it is then involved in an accident are all foreseeable, ordinary links in the chain of causation leading from the sale to the injury.

*Id*. (emphasis added).

Returning to our hypothetical of an individual who physically takes possession of a drink presented to him but secretes it for off-premises consumption, because the duty to patrons recognized in *Poole* and narrowed by the Dram Shop Act was predicated on the problem of the consumption of alcohol prior to driving, we do not think it would be consistent with Legislative intent to impose a duty on providers to protect non-purchasers against the mere possession of alcohol for later off-premises consumption. *See In re D.S.*, 602 S.W.3d at 514; *see also* TEX. GOV'T CODE ANN. § 311.023(1)–(3) (noting that when interpreting a statute, we may consider the "object sought to be attained," the "circumstances under which the statute was enacted," and "legislative history").

For example, in *Moore*, the plaintiff sued under the Dram Shop Act and common law negligence based on an accident caused by an individual who was allowed to enter a bar to use the bathroom and got into a fight, but did not purchase or consume any alcohol on the premises. 903 S.W.2d at 902 (affirming summary judgment in favor of defendants as to Dram Shop Act claim because "Ginsel was not provided, sold, or served alcoholic beverages"). When addressing the appellant's common law negligence claim, the *Moore* court first recognized the general rule that "a person is under no duty to control

24

the actions of third persons absent a special relationship," and concluded that the alleged intoxicated individual

> entered the establishment with a friend, went to the restroom, was involved in some kind of altercation in the bar (which is not described in the record), and left the premises. He was not served, provided, or sold, *and did not consume*, any alcohol on the premises. There was no special relationship involved.

*Id*. at 903 (emphasis added).

Although this language was pertinent to the *Moore* court's negligence analysis, we find its language regarding duty useful in describing situations where there is no sale and no evidence of on-premises consumption. *See* 903 S.W.2d at 904 ("In the instant case, there is no special relationship between the bar and Ginsel. *Ginsel did not buy anything at the bar; nor did he consume any alcoholic beverages while on the premises*. He was not a customer, an employee, a child, or any other relation which might give rise to a duty.") (emphasis added).

Because the alleged obviously intoxicated person did not purchase alcohol, whatever the scope of the verbs "[p]roviding" or "serving," TEX. GOV'T CODE ANN. § 2.02(b), by failing to provide any evidence that the individual non-purchaser "consume[d] alcohol on the premises," no duty was triggered. *Moore*, 903 S.W.2d at 904; *see Duenez,* 237 S.W.3d at 685 (distinguishing a duty owed to purchasers from a duty owed to patrons). Where the alleged obviously intoxicated individual is a non-purchaser, the scope of "recipient" simply does extend to situations where there is no evidence of on-premises consumption, because absent such evidence, there is no affirmative act by which the individual has completed an actionable instance of providing or serving alcohol that renders the individual a "recipient" under the Act. TEX. ALCO. BEV. CODE ANN.

§ 2.02(b)(2).

Consider the decision in *Pena v. Neal, Inc.*, where the Fourth Court of Appeals reversed a summary judgment under the Dram Shop Act. 901 S.W.2d 663, 665–66 (Tex. App.—San Antonio 1995, writ denied). In *Pena*, a plaintiff sued the provider alleging that a store clerk, Margarito de la Cruz, had provided Margaret Sturm alcohol before a deadly car accident. *Id*. at 669. The evidence established that on the night in question, Sturm had been consuming alcohol in her parked car outside of a convenience store and had been seen by de la Cruz, who acknowledged Sturm's intoxication in front of other customers and flashed a flashlight into her car several times to warn her against visibly drinking alcohol. *Id*. As part of the summary judgment evidence, the defense provided an affidavit from de la Cruz which stated that he "did not sell, serve, give or provide Sturm with any alcoholic beverages" on the night in question. *Id*. Evaluating the de la Cruz's affidavit, the *Pena* court concluded that the affidavit evidence did not defeat the plaintiff's claim because the plaintiff had presented circumstantial evidence of "a course of conduct or a personal relationship" in which de la Cruz would routinely allow Sturm to consume alcohol on the premises:

> [Sturm] would either buy beer or de la Cruz would give it to her, and she would drink some and put some in the car. [According to Sturm's sister,] "He would give her beer." She said she knew of five times between November, 1991, and March of 1992 when she did not pay for the beer she got from de la Cruz. "He would go and get them out of the cooler and give them to her." When de la Cruz and [Sturm] were talking, he would go and get one beer and she would drink it, then another, and she would drink it, and then another, and she would drink it. Asked if she consumed the alcohol on the premises, the sister stated that she did. Sometimes [Sturm] got the beer from the cooler herself. When she was given the beer, she consumed it on the premises.

*Id*. at 670.

26

The Fourth Court of Appeals reasoned that, despite de la Cruz's affidavit, the summary judgment evidence related to de la Cruz's prior course of conduct raised a fact issue as to causation:

> Thus, in the present case, a fact issue is raised by the circumstantial evidence, since it is fairly and reasonably inferred from the evidence presented. There is summary judgment evidence of ongoing transactions between Margaret Sturm, a known alcoholic, and de la Cruz, the night manager of the Fina One Stop, the only source of alcoholic beverages after hours in that area. There is evidence that he provided the person, who was either on her way to obvious intoxication or who was already obviously intoxicated, with alcoholic beverages several times a week during a several months' period until her death. These transactions, which are similar occurrences over an extended period of time, are relevant to prove that the conduct of de la Cruz on the occasion in question, the early morning hours of May 16, 1992, was in conformity with his habit of providing Sturm with alcoholic beverages. The facts raised by appellants show a course of dealing between de la Cruz and Sturm, which is probative of, and goes to, the fact question of causation.
>
> The defensive matter in issue, as asserted by the movant, is whether or not Neal provided alcoholic beverages to an already intoxicated [Sturm]. Evidence of the similar occurrences on many other occasions would be admissible if it tends to illuminate the particular occurrence in question and show the relationship of these parties. Further, the similar occurrences would be admissible to explain de la Cruz's conduct on those other occasions when Margaret Sturm obtained alcoholic beverages from him after regular sales hours. The same or similar conditions (providing alcoholic beverages to an obviously intoxicated person on previous occasions) may show a course of dealing and tend to prove a fact issue.

*Id*. at 671–72.

As illustrated by *Pena*, a commercial retailer with a license to sell alcohol can be liable for providing an obviously intoxicated individual with alcohol, even where there is no evidence of a particular sale or service. *See id*. Because the summary judgment evidence established, in part, that Sturm "was permitted by de la Cruz to get alcoholic beverages from the cooler, and she would help herself to the store's alcoholic beverages,

27

beer or wine, *consuming them either in the store or in her car*," *id*. at 669 (emphasis added), summary judgment was not appropriate. As the *Pena* court reasoned, the prior course of conduct between de la Cruz and Sturm, including Sturm's grabbing of beers from the cooler and consuming them on the premises, "are similar occurrences over an extended period of time, [and] are relevant to prove that the conduct of de la Cruz on the occasion in question, . . . was in conformity with his habit of *providing* Sturm with alcoholic beverages." *Id*. at 671 (emphasis added). Although the *Pena* court did not attempt to define "provision," it recognized that a provision could occur where there is no evidence of any particular sale or service, so long as the evidence otherwise establishes that a provider allowed an obviously intoxicated individual to consume alcohol on the premises prior to driving, including circumstantial evidence that the provider had allowed the individual to consume alcohol on the premises on prior occasions. *See id*. at 669–72.

This conclusion is consistent with the drafting history of Chapter 2, which reveals that the words "but is not limited to" in the definition of "provision," TEX. ALCO. BEV. CODE ANN. § 2.01(2), was intended to capture a range of conduct co-extensive with the conduct of a social host. The definition of "provision" was first proposed with a corresponding definition of "provider" that imposed social host liability as follows:

> "Provider" means a supplier, seller, or server of an alcohol beverage *and includes without limitation a person who provides an alcoholic beverage without a charge as a "host"* or a person who sells or serves an alcoholic beverage [under a permit or license].

S. Comm. on Economic Development, 70th leg., R.S., Tex. C.S.H.B. 1652 (May 25, 1987).

When § 2.01 was first proposed, the only use of the root verb "to provide" in the

definition of "provider" appeared in the context of the clause relating to social hosts. *See id*. Although the definition of "provider" was narrowed, the Legislature did not likewise narrow the definition of "provision." *See id*; TEX. ALCO. BEV. CODE ANN. § 2.01(2). In other words, when first proposed, the verbal noun "provision" was meant to capture a range of conduct co-extensive with a social host's potential liability. Because the phrase "but is not limited to" in the definition of "provision" was intended to reach conduct relevant to the social host situation, it would be odd to construe that same language as applying to a situation where a commercial retailer merely sells alcohol without any evidence of on-premises consumption. This is because the issue of social-host liability has centered on the problems associated with drinking and driving. As the Texas Supreme Court has noted, the following "range of issues [are] involved in social host liability":

> the amount of damage caused by drunk drivers, the percentage of that damage for which a social host was at some point involved, the extent to which automobile insurance of all types already provides a remedy to victims, the effect that the added liability would have on homeowners' and renters' insurance rates, the possibilities of alternative remedies, the possibilities of limiting the host's liability, and proscribing standards of conduct for social hosts.

*Merritt*, 940 S.W.2d at 604 n.3 (cleaned up).

Likewise, in *Graff v. Beard*, the issue of social-host liability was framed as whether "to impose a common-law duty on a social host who makes alcohol available to an intoxicated guest *who the host knows will be driving*." 858 S.W.2d at 918 (emphasis added). The *Graff* court refused to impose such a common law duty, reasoning that

> As the common law has long recognized, the imbiber maintains the ultimate power and thus the obligation to control his own behavior: to decide to drink or not to drink, to drive or not to drive. We therefore conclude that the common law's focus should remain on the drinker as the person primarily responsible for his own behavior and best able to avoid the foreseeable

29

risks of that behavior.

858 S.W.2d at 921–22.

However ambiguous the term "but is not limited to," the scope of that ambiguity is limited to situations that approximate the conduct of a social host. *See Rapanos*, 547 U.S. at 752 (noting that although drafting errors in a statue may render some terms "in *some* respects ambiguous," the "*scope* of that ambiguity . . . does not conceivably extend" beyond situations inconsistent with its textual limitations); *see also Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) ("[E]ven if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole."). For a non-purchaser of alcohol, it simply makes no sense to extend the Dram Shop Act to situations where there is no nexus between a provider's actions in making alcohol available to a patron and the patron's consumption of that alcohol, as the dangers inherent in drinking and driving, and forming the basis of the common law duty recognized in *Poole*, would be absent. *See Sewell*, 858 S.W.2d at 356 ("Chapter 2 is intended to deter providers of alcoholic beverages from *serving* alcoholic beverages to obviously intoxicated individuals who may potentially inflict serious injury on themselves and on innocent members of the general public" (emphasis added)); *see also Evans v. Joleemo, Inc.*, 714 S.W.2d 394, 396 (Tex. App.—Corpus Christi–Edinburg 1986) (referring to the 1979 edition of *Black's Law Dictionary* and defining a "dramshop" as "a drinking establishment where liquors are sold *to be drunk on the premises*; a bar or saloon") (emphasis added).

As illustrated above, making alcohol available for later consumption without a fee does not comport with the conduct of a social host, and it does not fall under the purview

30

of the drinking and driving problem. *See, e.g.*, *Gaff*, 858 S.W.2d at 921 (describing a hypothetical social host situation where a "host venture[s] to make alcohol available to adult guests," and noting the difficulty in a social host's ability to "accurately determine how much alcohol guests have consumed   and when they have approached their limit," presumably, with that consumption occurring on their premises). For example, even under *Poole*, if a social host held a dry gathering where he physically handed individuals a twelve-pack of beer as they left his door, such conduct would not be actionable because there would be no on-premises consumption, and none of the dangers inherent in the social host situation would be present. *See Merritt*, 940 S.W.2d at 604 n.3.

Neither the Dram Shop Act nor *Poole* abrogated the common law rule on non-liability as it relates to the bare furnishing or making available of alcohol for later consumption without a fee. Neither the Dram Shop Act nor *Poole* abrogated the common law rule that in such situations, "focus should remain on the drinker as the person primarily responsible for his own behavior and best able to avoid the foreseeable risks of that behavior." *Graff*, 858 S.W.2d at 922. We must cautiously construe the statute against this common law background. *See Sewell*, 858 S.W.2d at 354; *see also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 318 (2012) (noting that although "[i]t has often been said that statues in derogation of the common law are to be strictly construed," "[t]he better view is that statues will not be interpreted as changing the common law unless they effect the change with clarity").

For all the above reasons, we conclude that where an obviously intoxicated individual does not purchase alcohol, to qualify as a "recipient" under the Dram Shop Act, TEX. ALCO. BEV. CODE ANN. § 2.02(b)(2), he or she must consume alcohol on the

31

premises. *See Pena*, 901 S.W.2d at 669–72. The same way that taking possession of an item completes a sale, the consumption of alcohol completes a particular instance of serving or providing under the Dram Shop Act. Without such a limitation, the statute would lead to liability in situations not clearly within the purview of the Dram Shop Act, and the mere presence of an individual in a provider's establishment or the mere possession of an alcoholic drink, detached from any on-premises consumption, could be the basis of a cause of action by a creative plaintiff. *See Malouf*, 694 S.W.3d at 718 (noting that we cannot interpret the meaning of terms in a way that "leads to absurd results"). Absent sufficient clarity in the statute, *see Sewell*, 858 S.W.2d at 354, we do not think it would be consistent with the Legislature's intent to impose a duty on providers to protect against the actions of non-purchasers who do not consume alcohol on the premises. See *In re D.S.*, 602 S.W.3d at 514; *see also* TEX. GOV'T CODE ANN. § 311.023(1)–(3).

All parties agree that Padilla purchased the alcohol and left the store with the beer in his own hands. Appellants do not allege that 7-Eleven served alcohol to anyone. There is no allegation that the sale of alcohol to Padilla was part of a course of conduct in which 7-Eleven otherwise allowed Maranda to consume alcohol on its premises. *See Pena*, 901 S.W.2d at 669–72. Because Maranda was not the purchaser of the alcohol, absent any evidence of on-premises consumption of alcohol, we agree with 7-Eleven that Maranda did not qualify as a "recipient" under the Dram Shop Act as a matter of law. *See* TEX. ALCO. BEV. CODE ANN. § 2.02(b)(2). Accordingly, 7-Eleven is entitled to summary judgment. *See Energen Res. Corp.*, 642 S.W.3d at 509.

The concurrence would avoid any talk of on-premises consumption in favor a rule that would define "provision" to require "an intentional transaction between the provider

32

and the recipient whereby the provider affirmatively acts to transfer the possession of the alcohol to the recipient as part of that transaction." The main complaint against a requirement of on-premises consumption for a non-purchaser to qualify as a "recipient" under the Dram Shop Act, TEX. ALCO. BEV. CODE ANN. § 2.02(b)(2), is that such a requirement is nowhere found in the statute. However, also absent from the statute is the concurrence's requirement that a provision be an "intentional transaction" where a provider "affirmatively acts to transfer the possession of the alcohol." In fact, focusing on the intent of the provider is inconsistent with the drafting history of the Dram Shop Act, which shows that the Legislature considered but omitted a knowledge requirement from the statute. *See* S. Comm. on Economic Development, 70th leg., R.S., Tex. C.S.H.B. 1652 (May 25, 1987) (requiring that "the provision was knowingly and willfully made under the circumstance"). Further, the concurrence's interpretation would lead to situations where a provider may avoid liability by allowing an obviously intoxicated non-purchaser to consume alcohol on the premises, but where there is no affirmative act on the part of the provider, even where the provider has knowledge of and consents to the consumption. *Cf., Pena*, 901 S.W.2d at 670–72 (referring to the driver's conduct in grabbing "beer from the cooler herself" as illustrative of "providing alcoholic beverages to an obviously intoxicated person"); *see also* TEX. GOV'T CODE ANN. § 311.023(5); *Malouf*, 694 S.W.3d at 718.

The concurrence agrees with us that the word "provision" is ambiguous. We have only tried to properly narrow the scope of that ambiguity, conscious of the common law rule of non-liability, and sensitive to the concerns underlying passage of the Dram Shop Act. *See Rapanos*, 547 U.S. at 752; TEX. GOV'T CODE ANN. § 311.023(2), (4). We do not

33

provide an exhaustive definition of the word "provision"; but rather, only conclude that there can be no liability under the Dram Shop Act where a plaintiff provides no evidence that the alleged obviously intoxicated individual either purchased the alcohol from the provider or consumed any alcohol on the premises, no matter how creative the claim, and where "on the premises" means no more and no less than what is conveyed by that same phrase in the definition of a "dramshop" found in legal dictionaries. *See Evans*, 714 S.W.2d at 396 (referring to the 1979 edition of *Black's Law Dictionary* and defining a "dramshop" as "a drinking establishment where liquors are sold *to be drunk on the premises*; a bar or saloon") (emphasis added).[8]

## V. CONCLUSION

We affirm the trial court's summary judgment in favor of 7-Eleven.[9]

L. ARON PEÑA JR.
Justice


Concurring Opinion
By Justice Silva.

Delivered and filed on the
14th day of February, 2025.

---

[8] The concurrence states that our interpretation "affects other provisions of the Act not before us in this appeal." We have only addressed those provisions of the Dram Shop Act presented by the parties, namely, § 2.01 and § 2.02(b).

[9] Because we have affirmed the trial court's summary judgment on the ground that Maranda was not provided alcohol under the statute, we need not address 7-Eleven's other summary judgment grounds and remaining issues, as they are not dispositive to this appeal. *See* Tex. R. App. P. 47.1.